**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**MARK RENFRO,** *et al.*,

      **Plaintiffs,**                          **CASE NO.: 07-2098-BWK**

**v.**

**UNISYS CORPORATION,** *et al.*,

      **Defendants.**

**PLAINTIFFS' OPPOSITION TO
THE FIDELITY DEFENDANTS' MOTION TO DISMISS**

## Table of Contents

INTRODUCTION ..................................................................................................................1

FACTS ...............................................................................................................................2

ARGUMENT

    I.   THE PLAN PAID UNREASONABLE FEES ...............................................................5

        A.  Rule 12(b)(6) Standard. ......................................................................................5

        B.  Plaintiffs Have Stated A Claim for Breach of Fiduciary Duty Regarding the Payment of Unreasonable Fees. ......................................................................................5

    II.  THE FIDELITY DEFENDANTS ARE FIDUCIARIES ....................................................11

        A.  Fiduciary Status Is A Fact-Intensive Inquiry that Cannot Be Decided At The Pleading Stage ......................................................................................................12

        B.  FIIOC is a Functional Fiduciary. .........................................................................15

            1.  FIIOC is a Fiduciary Because It Exercises Control Over the Disposition or Management of Plan Assets ......................................................................15

            2.  FIIOC Is A Fiduciary Because, In Practice, It Exercises Authority Over The Selection Of The Plan's Investments. ........................................................21

            3.  FIIOC is a Fiduciary Under ERISA § 3(21)(A)(ii) ......................................24

        C.  FMTC is a Named Fiduciary and a Functional Fiduciary. .............................................28

        D.  FMRCo is a Functional Fiduciary ......................................................................30

    III.  PLAINTIFFS' OTHER CLAIMS ARE ALSO ADEQUATELY PLEADED AND DO NOT DEPEND ON THE FIDELITY DEFENDANTS' FIDUCIARY STATUS ...............32

        A.  Count II States A Claim. ......................................................................................32

            1.  Count II States a Claim, Even If, Assuming *Arguendo*, The Fidelity Defendants Are Not Fiduciaries ......................................................................32

            2.  Count II States a Claim for Appropriate Equitable Relief. ...............................33

               a.  Count II is not redundant. ......................................................................33

               b.  Count II's equitable remedies are not preempted by the federal securities laws. ......................................................................................................35

        B.  Count III States a Claim ......................................................................................38

    IV.  Plaintiffs Should Be Permitted to Amend Their Complaint. ..............................................39

CONCLUSION ....................................................................................................................40

## **Table of Authorities**

Cases

*A. Ronald Sirna, Jr., P.C. Profit Sharing Plan v. Prudential Secs., Inc.*, 964 F. Supp. 147 (S.D.N.Y. 1997) ........................................................................................................................30

*Arber v. Equitable Beneficial Life Ins. Co.*, 889 F. Supp. 194 (E.D. Pa. 1995) ..............................13

*Bell Atl. Corp. v. Twombly*, --- U.S. ---, 127 S. Ct. 1955 (2007) .............................................5, 6, 7, 8

*Bishop v. New Jersey Dept. of Corrections*, No. 05-5532 (RWB), 2007 WL 556894 (D.N.J. Feb. 13, 2007)........................................................................................................... 39-40

*Bixler v. Cent. Pennsylvania Teamsters Health & Welfare Fund*, 12 F.3d 1292 (3rd Cir. 1993) .....36

*Blatt v. Marshall and Lassman*, 812 F.2d 810 (2d Cir. 1989) ..........................................................21

*Board of Trustees of Teamster Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164 (3rd Cir. 2003) ..............................................................................................................................................39

*Broadcom v. Qualcomm, Inc.* --- F.3d ---, 2007 WL 2475874 (3rd Cir. Sep. 4, 2007) ......................6

*Brock v. Hendershott*, 840 F.2d 339 (6th Cir. 1988) ........................................................................21

*Brock v. Robbins*, 830 F.2d 640 (7th Cir. 1987) ................................................................................7

*Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286 (5th Cir. 2000) ...........................................................10

*Chapro v. SSR Realty Advisors, Inc. Severance Plan*, 351 F. Supp. 2d 152 (S.D.N.Y. 2004).........35

*Chicago District Council of Carpenters Welfare Fund v. Caremark,* 474 F.3d 463 (7th Cir. 2007)...............................................................................................................19, 20, 21

*Communications Workers of America, AFL-CIO v. Nynex Corp.*, No. 93 Civ. 3322 (LMM), 1998 WL 85323 (S.D.N.Y. Feb. 26, 1998)........................................................................................35

*Corbett v. Marsh & McLennan Cos.*, No. MDL 15863, 2006 WL 734560 (D. Md. Feb. 27, 2006)30

*Curtis-Wright Corp. v. Schoonejongen*, 514 U.S. 73 (1995)............................................................36

*DeGuiseppe v. Vertis, Inc.,* No. 04-4348, 2005 WL 2271865 (E.D. Pa. Sept. 15, 2005)................35

*Ellis v. Rycenga Homes, Inc.*, 484 F. Supp. 2d 694 (W.D. Mich. 2007) ...................................27, 28

*Erickson v. Pardus*, --- U.S. ---, 127 S. Ct. 2197 (2007) ...............................................................6, 7

*Eslava v. Gulf Telephone Co.*, 418 F. Supp. 2d 1314 (S.D. Ala. 2006) ..........................................14

*Glaziers and Glassworkers Local Unions No. 252 Annuity Fund v. Newbridge Secs, Inc.*, 93 F.3d 1171 (3rd Cir. 1996)....................................................................................................................12

*F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250 (2d Cir. 1987) ..............................27

*U.S. v. Glick*, 142 F.3d 520 (2d Cir. 1997) ......................................................................18, 19, 20

*Great-West Life & Annuity Insurance Company v. Knudsen*, 534 U.S. 204 (2002) .......................38

*Haddock v. Nationwide Insurance Co.*, 419 F. Supp. 2d 156 (D. Conn. 2006)..............16, 17, 20, 23

*Harris Trust & Sav. Bank v. Salomon Smith Barney*, 530 U.S. 238 (2000) ...............................32, 39

*Hecker v. Deere & Company*, 2007 WL 452275 (W.D. Wis. Jun 21, 2007) ...........................14, 15

*Horvath v. Keystone Health Plan East, Inc.*, 333 F.3d 450 (3rd Cir. 2003)....................................31

*In re AIG Advisor Group Sec. Litig.*, No. 06 CV 1625 (JG), 2007 WL 1213395 (E.D.N.Y. Apr. 25, 2007) ...............................................................................................................................37

*In re Cardinal Health, Inc. ERISA Litig.*, 424 F. Supp. 2d 1002 (S.D. Ohio 2006) .......................14

*In re CMS Energy ERISA Litig.*, 312 F. Supp. 2d 898 (E.D. Mich. 2004) .....................................14

*In re Elec. Data Sys. Corp. "ERISA" Litig.*, 305 F. Supp. 2d 658 (E.D. Tex. 2004).....................14

*In re Exxon Mobil Corp. Sec. Litig.*, --- F.3d ---, 2007 WL 2410129...............................................5

*In re Schering-Plough Corp. ERISA Litig.*, No. 2007 WL 2374989 (D.N.J. Aug. 15, 2007) ..........13

*In re Schering-Plough Corp. ERISA Litig.*, 420 F.3d 231 (3d Cir. 2005) .......................................13

*In re Sprint Corp. ERISA Litig.*, 388 F. Supp. 2d 1207 (D. Kan. 2004) ........................................14

*In re Unisys Corp. Retiree Medical Ben. ERISA Litig.*, 57 F.3d 1255 (3rd Cir. 1995) ..............31, 36

*In re Unisys Sav. Plan Litig.,* 173 F.3d 145 (3rd Cir. 1998)......................................... 6, 9-10

*In re Worldcom, Inc. ERISA Litig.,* 263 F. Supp. 2d 745 (S.D.N.Y. 2003)....................................36

*In re Xcel Energy, Inc.*, 312 F. Supp. 2d 1165 (D. Minn. 2004) ..................................................14

*Indep. Enters. Inc. v. Pittsburgh Water & Sewer Auth.*, 103 F.3d 1165 (3d Cir.1997)...................32

*IT Corp. v. General Am. Life Ins. Co.*, 107 F.3d 1415 (9th Cir.1997)............................................12

*Jenkins v. Yager*, 444 F.3d 916 (7th Cir. 2006) ........................................................................10

*Johnson v. Georgia-Pacific*, 19 F.3d 1184 (7th Cir. 1994) .........................................................21

*Johnston v. Exelon Corp.*, No. 04-4040, 2005 WL 696896 (E.D. Pa. Mar. 23, 2005)....................25

*Jordan v. Federal Exp. Corp.*, 116 F.3d 1005 (3d Cir. 1997) .....................................................36

*Kling v. Fidelity Mgmt. Trust Co.,* 323 F. Supp. 2d 132 (D. Mass. 2004)......................................36

*Lake v. Arnold*, 232 F.3d 360 (3d Cir. 2000)............................................................................40

*Leigh v. Engle*, 727 F.2d 113 (7th Cir. 1984) ..........................................................................15

*Maniace v. Commerce Bank of Kansas City, N.A.*, 40 F.3d 264 (8th Cir.1994) .............................13

*Marks v. Independence Blue Cross*, 71 F. Supp. 2d 432 (E.D. Pa. 1999) ......................................26

*Massachusetts Mutual Life Ins. Co. v. Russell* 473 U.S. 134 (1985)..............................................34

*Mertens v Hewitt Assocs.,* 508 U.S. 248 (1993) ..................................................................12, 34

*Montville Twp. v. Woodmont Builders, LLC*, 2007 WL 2261567
 (3d Cir. Aug. 8, 2007)..........................................................................................................5

*Morrell & Co. v. John Hancock Mut. Life Ins. Co.*, No. 85 C 9166, 1988 WL 58619 (N.D. Ill. May 31, 1988)..................................................................................................................27

*Nobile v. Pension Committee of Pension Plan for Employees of New Rochelle Hosp.*, 611 F. Supp. 725 (S.D.N.Y. 1985)...................................................................................27

*Pietrangelo v. NUI Corp.*, No. 04-3223 (GEB), 2005 WL 1703200 (D.N.J. Jul. 20, 2005)......13, 15

*Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41 (1987) ........................................................34

*Procacci v. Drexel Burnham Lambert*, No. 89-0555, 1989 WL 121984 (E.D. Pa. 1989)...............25

*Rankin v. Rots*, 278 F. Supp. 2d 853 (E.D. Mich. 2003) .......................................14, 29, 36

*Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1 (2004) ........................23

*Reich v. Compton*, 53 F.3d 270 (3rd Cir. 1995)...................................................................32

*Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915 (8th Cir. 1994)...................................6, 7

*Schulist v. Blue Cross of Iowa*, 717 F.2d 1127 (7th Cir. 1983) ...................................26, 27

*Sereboff v. Mid-Atlantic Medical Services, Inc.*, --- U.S. ---, 126 S. Ct. 1869 (2006).....................38

*Siemers v. Wells Fargo & Co.*, No. 05-04518-WHA, 2007 WL 1140660 (N.D. Ca. Apr. 17, 2007) ........................................................................8, 37

*Siemers v. Wells Fargo & Co.*, No. 05-04518 WHA, 2007 WL 760750 (N.D. Ca. Mar. 9, 2007)........................................................18, 37

*Sixty-Five Security Plan v. Blue Cross & Blue Shield*, 583 F. Supp. 380, 387-88 (S.D.N.Y. 1984)27

*Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193 (3rd Cir. 2004) ...........................................39

*Srein v. Frankford Trust Co.*, 323 F.3d 214 (3rd Cir. 2003) ................................................12, 16

*Stanton v. Shearson/Lehman American Express, Inc.*, 631 F. Supp. 100 (N.D. Ga. 1986)..............22

*Stevenson v. Carroll*, 495 F.3d 62 (3rd Cir. Jul. 30, 2007) ................................................6

*Taylor v. United Technologies Corp.*, No. 06-1494 (WWE), 2007 WL 2302284 (D. Conn. Aug. 9, 2007) ........................................................................9

*Varity Corp. v. Howe*, 516 U.S. 489 (1996) ................................................33, 34, 35, 36

*Victaulic v. Tieman*, --- F.3d ---, 2007 WL 2389795 (3rd Cir. Aug. 23, 2007)...................................6

<u>Statutes</u>

29 U.S.C. § 1001 et seq............................................................................ *passim*
29 U.S.C. § 1002(21)(A)........................................................................... *passim*
29 U.S.C. § 1101....................................................................................16
29 U.S.C. § 1103....................................................................................1, 3
29 U.S.C. § 1104....................................................................................1, 3
29 U.S.C. § 1105....................................................................................29
29 U.S.C. § 1109....................................................................................32
29 U.S.C. § 1132(a)(3)............................................................................ *passim*

Rules and Regulations

Fed. R. Civ. P. 8(a)(2)...................................................................................................5
Fed. R. Civ. P. 8(e)(2)................................................................................................32
Fed. R. Civ. P. 12(b)(6)...............................................................................................8
29 C.F.R. § 2509.75-3................................................................................................30
29 C.F.R. § 2509.75-8..................................................................................................3
29 C.F.R. § 2510.3-21(c)............................................................................................24
29 C.F.R. § 2510.3-21(c)(ii)(B)...................................................................................25
29 C.F.R. § 2510.3-21(c)(ii)........................................................................................26
29 C.F.R. § 2510.3-101...............................................................................................16


Other materials

U.S. Pension and Welfare Benefits Administration "Study of 401(K) Plan Fees and Expenses" at
    § 2 (1998), *available at* http://www.dol.gov/ebsa/pdf/401kRept.pdf ...........................................9

DOL Adv. Op., 93-24A (Sept. 13, 1993)................................................................. 28-29

DOL Adv. Op. 97-15A (May 22, 1997) ........................................................................23

DOL Adv. Op. 97-16A (May 22, 1997) ........................................................................24

DOL Adv. Op. 03-09A (June 25, 2003) ........................................................................24

DOL Letter, Robert J. Doyle of Director of Regulations and Interpretations, to Ms. Judith A.
    McCormick, Federal Counsel, American Bankers Association, (August 11, 1994) .................29

House Conference Rep. No. 93-1280, 93rd Congress, reprinted in 1974 U.S. Code Cong. &
    Admin. News 4639, 5038, 5103 ..........................................................................25

Statement of Marvin Mann, Chairman of the Independent Trustees of The Fidelity Funds, Before
    the Senate Committee on Banking, Housing and Urban Affairs on "Review of Current
    Investigations and Regulatory Actions Regarding the Mutual Fund Industry:  Fund
    Operations and Governance" (March 2, 2004), *available at*
    http://banking.senate.gov/_files/mann.pdf ......................................................... 37-38

## INTRODUCTION

Plaintiffs oppose the Motion to Dismiss filed by Defendants Fidelity Management Trust Company (FMTC), Fidelity Management & Research Company (FMRCo) and Fidelity Investments Institutional Investments Company (FIIOC) (collectively "the Fidelity Defendants") on September 7, 2007.

The Employment Retirement Income Security Act (ERISA), 29 U.S.C. § 1002 *et seq.*, governs the operations of 401(k) plans, like the Unisys Savings Plan at issue here. ERISA requires that the plan's assets be used "solely for the exclusive purposes of providing benefits to participants" and for "defraying reasonable expenses of administering the plan." ERISA § 403(c), 29 U.S.C. § 1103(c). It also mandates that plan fiduciaries discharge their fiduciary duties "solely in the interest of the participants and beneficiaries" and "with the care, skill, prudence, and diligence" that a "prudent man" acting in a similar capacity would use under similar circumstances. ERISA, § 404(a)(1), 29 U.S.C. § 1104(a)(1).

The Fidelity Defendants insist that they are immune from liability under ERISA because all expenses were reasonable and because they are not subject to ERISA's fiduciary requirements. They accuse Plaintiffs of resorting to mere "labels and conclusions" when assigning blame for the Unisys Savings Plan's losses. *See*, *e.g.*, Memorandum in Support of Motion to Dismiss Plaintiffs' Amended Complaint for Breach of Fiduciary Duty ("Mem."), Ct. Doc. 13, at 7. Yet they ask the Court to accept at face value their own version of "labels and conclusions" in construing the existence and scope of the fiduciary duties they owe the Plan.

In the First Amended Complaint ("FAC"), Plaintiffs allege that the investment options chosen for the Plan by the Defendants were imprudent and unreasonably expensive, even if the

Fidelity Defendants have successfully marketed them to other plans in other situations.  Plaintiffs allege that no matter what exculpatory form language the Fidelity Defendants put in their contract, in actuality, Defendants FIIOC, FMTC, and FMRCo exercised control over Plan assets for their own benefit, arranged to pay themselves in a manner that allows them to control the amount and type of their compensation, selected the Plan's investment options to ensure that their compensation would continue to increase dramatically, knowingly received excessive compensation, and rendered investment advice to the other Plan fiduciaries.  And Plaintiffs point out that even if the Fidelity Defendants were found not to be fiduciaries, they are still liable under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).  For these reasons, the Fidelity Defendants' motion should be denied.

## FACTS

Plaintiffs Mark Renfro and Gerald Lustig are participants in the Unisys Savings Plan (the "Plan") and bring suit on behalf of the Plan and its participants.  FAC, ¶¶ 3-4, 17, 20.  More than thirteen years ago, Unisys Corporation, as sponsor of the Plan, entered into a contract with Defendant FMTC in which FMTC and its delegates, including Defendant FIIOC, agreed to provide certain services to the Plan and to another plan, the Unisys-sponsored "RIP" plan.  FAC, ¶ 26; Trust Agreement, Ct. Doc. 13-5 at 35[1]; § 15(a), at 29 (performance of contract by FIIOC).  The Unisys Defendants agreed to use the participants' money to pay for those services.  Trust Agreement, Ct. Doc. 13-5, § 7, at 25 (fees will be deducted from the participants' accounts).

Unisys Corporation and FMTC agreed that FMTC and its affiliate, Defendant FMRCo, would manage all of both Plans' assets (estimated to be at least $1.8 billion at that time).  FAC, ¶ 26-27, 31; Trust Agreement, Ct. Doc. 13-5, §§ 1(j) at 3, § 5(b), at 9-10 (description of

---

[1]    The page numbers refer to the numbers assigned by the CM/ECF system.

investments); at 38 (estimate of assets).  They also agreed that FMTC and FIIOC would provide

custodial, administrative and record keeping services to the Plan.  Trust Agreement, Ct. Doc. 13-

5, at 8, 23.  The price at which FMTC's and FIIOC's services would be provided was contingent

upon the Unisys Defendants maintaining at least 56 Fidelity-branded funds as investment options

in the Plans.  Trust Agreement, Ct. Doc. 13-5 at 35 (per person fees); at 38 ("fees are based on

the use of the investment options outlined in Schedule A, with the allowance for additional

Fidelity Investments options").

The Trust Agreement contains language purporting to exculpate FMTC and FIIOC from

most fiduciary liability by parroting the language of ERISA and its regulations. For example, the

Trust agreement states that FMTC's role would be "ministerial in nature … and provided within

a framework of plan provisions, guidelines and interpretations conveyed … by the

Administrator," quoting the language of 29 C.F.R. § 2509.75-8, D-2-Q.  *See* Ct. Doc. 13-5 at 2; §

6(a) at 9.  *See also id.* at § 3 at 8-9 (tracking 29 U.S.C. § 1104(a)(1)(A)(i)); at 12-13 (tracking 29

U.S.C. § 1103(a)(1)).  Plaintiffs contend that the Fidelity Defendants' actual role with respect to

the Plan and its assets was much greater than the acts labeled "ministerial" by the Trust

Agreement and that despite the Trust Agreement's prohibitions, the Fidelity Defendants did play

a role in the selection of investment options and did exercise control over Plan assets.  FAC, ¶¶

12-16, 49.

Throughout the Fidelity-Unisys relationship, the Unisys Defendants' role was essentially

passive, serving as a rubber stamp for the Fidelity Defendants' directions.  During the 13-year

history of the Unisys-Fidelity relationship, the Plan continued to add Fidelity-branded funds and

to have the Fidelity Investments companies be the sole provider of all services to the Plan.  FAC,

¶¶ 27, 48.  The majority of the Fidelity-branded funds in the Plan were actively managed retail

mutual funds, the same mutual funds Fidelity Investments sells directly to small investors.  FAC, ¶ 28, 59-62.  Plaintiffs allege that the Plan fiduciaries failed to prudently examine any investment alternatives more suitable or appropriate for large plan investors and continued to add funds geared toward small investors throughout the last decade.  FAC, ¶¶ 27, 31, 38-42.  As a result of these actions, the Plan paid unreasonable expenses and experienced losses.  FAC, ¶ 42.

Plaintiffs further allege that due to the manner in which the Fidelity Defendants agreed to be paid – through a "revenue-sharing" arrangement rather than directly from the Plan – they were able to exercise control over the amount of Plan assets directed toward administrative costs, sales efforts or other services instead of investment management, and that as a result, the Plan paid unreasonable administrative and other fees.  FAC, ¶¶ 45-54.  Plaintiffs also allege that because one or more of the Fidelity Defendants had control of the Plan assets, they were able to use those assets for their own purposes and not for the exclusive benefit of the Plan and its participants.  FAC, ¶ 55-57.

In conjunction with the above, Plaintiffs allege that the Fidelity Defendants exercised control over Plan assets and that FIIOC (and possibly FMTC) provided "investment advice" to the Plan.  Plaintiffs allege that FMTC was named as a fiduciary in the Trust Agreement and that it committed a fiduciary breach within the scope of those duties.  Plaintiffs allege that FMTC also is liable as a co-fiduciary for the acts of the Unisys Defendants.

Finally, Plaintiffs have also pleaded in the alternative that if the Fidelity Defendants are found not to be fiduciaries, they can still be liable to the Plan as non-fiduciaries under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).  And, to the extent that the Court finds that any of Plaintiffs allegations are insufficient, any dismissal should be without prejudice and with leave to amend.

I.      **PLAINTIFFS HAVE PLEADED FACTS SHOWING THAT THE PLAN PAID UNREASONABLE FEES.**

A.      **Rule 12(b)(6) Standard.**

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Bell Atl. Corp. v. Twombly*, --- U.S. ---, 127 S. Ct. 1955, 1964 (2007).  "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint."  *In re Exxon Mobil Corp. Sec. Litig.*, --- F.3d ---, 2007 WL 2410129, at *1 & n.1 (3rd Cir. Aug. 27, 2007) (citing *Twombly*). The Court should determine whether the complaint contains "either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory."  *Twp. v. Woodmont Builders, LLC*, 2007 WL 2261567, at *2 (3d Cir. Aug.8, 2007) (citing *Twombly*).

B.      **Plaintiffs Have Stated A Claim for Breach of Fiduciary Duty Regarding the Payment of Unreasonable Fees.**

The Fidelity Defendants first argue that Plaintiffs have failed to plead facts indicating that the Plan fiduciaries breached their fiduciary duty when they caused the Plan to pay unreasonable fees.  Mem. at 7-9.  They claim that because Plaintiffs did not quantify the amount of the unreasonable fees, and did not specify comparators who obtained the same services more cheaply, the FAC is merely "labels and conclusions."  *Id.* at 7-8 (fees); 9 (other plan fiduciaries). They also argue that because mutual funds are popular investments in 401(k) plans – at least according to the mutual fund industry's trade association – they are prudent investments as a matter of law.  Mem. at 9-10.  These arguments overstate federal pleading requirements, incorrectly construe Third Circuit law and statutory language, and ignore the allegations of the FAC itself.

First, neither the U.S. Supreme Court nor the Third Circuit has endorsed the Fidelity Defendants' view that, post-*Twombly,* all plaintiffs now labor under a heightened pleading standard, requiring them, for example, to plead an exact figure of damages.  *See* Mem. at 9.  In *Erickson v. Pardus*, decided two weeks after *Twombly*, and quoting *Twombly*, the Supreme Court reiterated its long-held pleading rule that plaintiffs are *not* required to allege specific facts, and their statement need only "give the defendant fair notice of what the ... claim is and the grounds upon which it rests."  *Erickson*, --- U.S. ---, 127 S. Ct. 2197, 2200 (2007).  While *Twombly* may have "retired" one formulation of the motion to dismiss standard, it did not rewrite the rule.  In fact, *Twombly* cited as an example of a suitable complaint one that stated only that "the defendant negligently drove a motor vehicle against plaintiff," and provided no details of how or why the defendant was alleged to be negligent.  *Twombly*, 127 S. Ct. at 1971 & n.10 (sufficient to give notice); at 1977 (dissent; quoting form complaint).[2]

Of course, Plaintiffs easily meet this standard, however it is expressed.  The elements of a breach of fiduciary duty claim are: (1) the existence of a fiduciary relationship; (2) the breach of that duty by failing to employ "the appropriate methods to investigate and determine the merits of a particular investment"; and (3) losses caused by the breach, since it is possible that even the most heedless fiduciary might have stumbled onto an investment that a "hypothetical prudent fiduciary" would have chosen, albeit by chance instead of through foresight.  *See In re Unisys Sav. Plan Litig. (Unisys II),* 173 F.3d 145, 153-54 (3rd Cir. 1998) (describing items (2) and (3)); *Roth v. Sawyer-Cleator Lumber Co*., 16 F.3d 915, 919 (8th Cir. 1994) (discussing connection

---

[2]       The Third Circuit does not appear to have regarded *Twombly* as a watershed event.  Most of its post-*Twombly* decisions simply point out that *Twombly* retired the "no set of facts" formulation and required that Rule 8's "short and plain statement" of the facts present facts indicating more than a "speculative" entitlement to relief.  *See*, *e.g., Broadcom v. Qualcomm, Inc.* --- F.3d ---, 2007 WL 2475874, at * 14 (3rd Cir. Sep. 4, 2007) (reversing dismissal); *Victaulic v. Tieman*, --- F.3d ---, 2007 WL 2389795, at * 5 (3rd Cir. Aug. 23, 2007) (reversing dismissal); *Stevenson v. Carroll*, 495 F.3d 62, 66 (3rd Cir. Jul. 30, 2007) (finding complaint sufficient).

between losses and fiduciary conduct); *Brock v. Robbins*, 830 F.2d 640 (7th Cir. 1987) (same).[3]

The FAC describes at least four ways in which those persons identified as Plan fiduciaries

breached their duties to allow the Plan to pay only reasonable costs and caused losses to the Plan;

those losses being the difference between what the Plan actually paid and what the Plan should

have paid, had its fiduciaries exercised prudence:

- the Plan paid the same retail prices for investment management as the smallest investors, even though it was in the largest 1% of all 401(k) plans, whereas a prudent fiduciary in that situation would have obtained  the same or equivalent services at a significantly lower rate (FAC, ¶¶ 28, 31, 38-39, 42);

- the Plan paid increasingly large fees for the services it received, whereas a prudent fiduciary in that situation would have recognized this, and prudently comparison-shopped or negotiated to ensure that the fees were consistent with the level of service (FAC, ¶¶ 51-54);

- the Plan's assets were used to generate monies, such as interest on the "float," that were not captured for the benefit of the Plan and the participants, whereas a prudent and loyal fiduciary in that situation would have made sure that the funds were used exclusively for the Plan's benefit (FAC, ¶¶ 55-58);

- the Plan was heavily invested in expensive, actively managed mutual funds that not only cost more than index funds, but also fail statistically to outperform index funds over the long term, whereas a prudent fiduciary would have been aware of the failings of actively managed funds and curtailed or diminished their presence in the Plan (FAC, ¶¶ 61-62).

The FAC not only "give[s] the defendant fair notice of what the ... claim is and the grounds upon

which it rests," *Erickson*, 127 S. Ct. at 2200, but it also contains allegations, made directly or

through inference, regarding the material elements of a breach of fiduciary duty claim, *Twombly*,

---

[3]      Of course *none* of these cases were decided at the pleading stage.  *In re Unisys II* affirmed a judgment rendered after a full trial on the merits, after the Third Circuit had earlier reversed the trial court's initial summary judgment decision.  *Roth* also reversed a grant of summary judgment, finding that the inquiry into the duty of prudence was a "fact-intensive inquiry that is not susceptible to summary judgment in this case."  *Roth*, 16 F.3d at 919.  *Brock* affirmed the district court's conclusion, after hearing testimony, that plaintiffs' expert witness could offer no opinion on the central issue in the case – whether the amounts the fiduciaries obligated the plan to pay were reasonable.  *Brock*, 830 F.2d at 645.

127 S. Ct. at 1969.[4]

Nonetheless, the Fidelity Defendants quibble with the FAC.  They first attempt to impose some type of heightened specificity requirement on the pleadings, suggesting that plaintiffs must be able to quantify their losses in the complaint.  Mem. at 8-9.  But *Twombly* made it quite clear that its holding did not "require heightened fact pleading of specifics."  *Twombly*, 127 S. Ct. at 1974.  Although decided before *Twombly*, the court in *Siemers v. Wells Fargo & Co.*, No. 05-04518-WHA, 2007 WL 1140660 (N.D. Ca. Apr. 17, 2007), found plaintiffs' allegations that the fees charged by mutual funds had been inflated to support a secret commission program to be sufficient for Rule 12(b)(6) purposes, even though plaintiffs did not allege the extent to which each expense ratio had been inflated.  *Id.* at * 1-3, *7-8.  The *Siemers* court found that "[a]t the pleading stage … it would be most unfair to insist that the complaint establish the extent of any excess.  No counsel could ethically pin this down at the pleading stage.  It should suffice if the complaint sets forth the facts from which the charge of excessiveness is specific and plausible."  *Id.* at *7.

The Fidelity Defendants also argue that because the FAC does not specifically allege that prudent fiduciaries in other large plans paid less money for the same thing[5] or that they "systematically avoided" the type of investments included in the Plan, Plaintiffs have failed to show losses.  Mem. at 9.  Citing the mutual fund industry's trade publication, they argue that Plaintiffs could not show these things because mutual funds are the "predominant investment

---

[4]     Nor is there anything implausible or difficult to understand about these claims.  *See Twombly*, 127 S. Ct. at 1965-66 (facts alleged must plausibly suggest elements of claim).  Plaintiffs' legal theory is clearly understandable from the allegations of the complaint and involves concepts readily comprehended by the average consumer, such as "comparison shopping" and "volume discount."

[5]     Actually, it does.  FAC, ¶¶ 21.B.iii; 38-39; 41, 70.A.

options in 401(k) plans today."[6]  Mem. at 9.  Because of this popularity, they argue that the

Plan's investment in mutual funds must have been prudent as a matter of law.

Popularity, however, is not prudence.  Just because millions of people invested in

dotcoms during the 1990s does not mean that they were a sound investment.  The Fidelity

Defendants' argument from popularity has been rejected at the pleading stage.  In *Taylor v.

United Technologies Corporation*, No. 06-1494 (WWE), 2007 WL 2302284, at * 4 (D. Conn.

Aug. 9, 2007), construing a complaint similar to the FAC, the court found that the plaintiffs met

their burden of stating a claim that the fees charged to a 401(k) plan were unreasonable.  *Id.*  The

*Taylor* defendants argued, much as the Fidelity Defendants do here, that because revenue sharing

was alleged to be a "ubiquitous industry practice," plaintiffs could not show that revenue sharing

resulted in unreasonable or excessive fees, since clearly other plan fiduciaries must be engaged

in the same activity.  *Id.*  The *Taylor* court rejected this reasoning, finding that "[t]he fact that

plaintiffs allege that revenue sharing is a common industry practice does not curtail their ability

to prove that, in this instance, it resulted in unreasonable fees.  The Court will not grant a motion

to dismiss on th[is] ground."  *Id.*

Despite the Fidelity Defendants' best efforts to create such a rule, Mem. at 8 & n.2,

courts have not given an all-purpose thumbs-up to any particular investment or category of

investments as a matter of law.  *In re Unisys II* did not "endorse" an across-the-board use of any

particular insurance company product.  *See* Mem. at 9 n.2.  The *Unisys II* court found only that at

---

[6]  Plaintiffs dispute the Fidelity Defendants' claims of popularity among the Unisys Plan's peers.  Although Plaintiffs object to the use of materials clearly outside the pleadings as "evidence," they point out, for example, that a 1998 federal government publication indicated that retail mutual funds were the predominant investment of "smaller" plans (those with $50 million in plan assets or less) while noting that "larger plans, typically with total assets of over $500 million, can realize substantial savings through such instruments.  **Total investment management expenses can commonly be reduced to one-fourth of the expenses incurred through retail mutual funds.**"  U.S. Pension and Welfare Benefits Administration "Study of 401(K) Plan Fees and Expenses**"** at § 2.(1998), *available at* http://www.dol.gov/ebsa/pdf/ 401kRept.pdf (emphasis added).

the time of purchase by the fiduciaries, a prudent fiduciary could not have realized how financially unsound an investment in Executive Life Insurance Company contracts would shortly become, since the company's flaws were well hidden – from state regulators, rating companies and fiduciaries alike.  173 F.3d at 153-54.  And, of course, *Unisys II* does not speak at all to pleading standards, since the district court was able to reach these conclusions only after a 10-day trial, and only after the Third Circuit reversed its initial grant of summary judgment, directing the court to consider specific factual questions about the fiduciaries' level of knowledge and degree of prudence in selecting the investments.  *Unisys II*, 173 F.3d at 151-53 (citing *Unisys I*).  *Compare Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 306-08 (5th Cir. 2000) (reversing summary judgment; finding that reasonable minds could differ as to whether a hypothetical prudent fiduciary would have selected Executive Life contracts for the plan).

Likewise, any comparison of the Unisys Plan — a $2.3 billion undertaking with more than 30,000 participants — to the 401(k) plan offered to "100 plus" employees by the sole proprietor of a small town auto-parts distributor is meaningless.  Mem. at 9 n.2 (citing *Jenkins v. Yager*, 444 F.3d 916 (7th Cir. 2006)).  Mr. Yager's plan was not an "enterprise of like character and like aim" to the Unisys Plan, one of the largest in the United States.  FAC, ¶ 31.  Any findings about the suitability or prudence of an investment in retail mutual funds are limited to the *Jenkins* facts; facts which did not include any allegation that the fees charged by those funds were unreasonable.  *Jenkins*, 444 F.3d at 926 (alleging that mutual funds became imprudent during market downturn of early 2000s).

Finally, the Fidelity Defendants are just plain wrong about the allegations in the FAC.  The Fidelity Defendants argue that the Plaintiffs fail to link "any assessment of the quality and nature of services" provided to the Plan with the amount of fees charged by the Fidelity

Defendants for the services provided to the Plan.  Mem. at 9.  However, in paragraphs 51-54 of

the FAC, Plaintiffs explain that the Plan fiduciaries failed to keep track of how much the Plan

paid for administrative fees so that the fees paid for the same services increased significantly

each year while the services provided remained the same.  The FAC states:  "As the raw amount

of fees collected from the funds rises each year, the amount of money available for Plan

administration also rises each year, even though the amount and type of services provided to the

Plan does not."  FAC, ¶ 53.  Plaintiffs also allege that the fiduciaries could have obtained the

same or equivalent investment management services for a lower price.  FAC, ¶¶ 28, 31, 38-39,

41-42.  These are precisely the types of cost/benefit inquiries the DOL expects plan fiduciaries to

make, and Plaintiffs allege that the Unisys Savings Plan fiduciaries failed to do so.

In sum, Plaintiffs have satisfied their pleading burden, however it is characterized.  They

have placed the Fidelity Defendants on notice of the claims, and have pleaded facts supporting

each element of a breach of fiduciary duty claim.

## II.	THE FIDELITY DEFENDANTS ARE FIDUCIARIES.

The Fidelity Defendants' arguments about their supposed lack of fiduciary status

represent the triumph of form over substance.  According to the Fidelity Defendants, because

they can point to a contract that purports to exempt them from fiduciary status, it does not matter

whether they in actuality do have any fiduciary authority or exercise any fiduciary control.

According to the Fidelity Defendants, because they set up a system for payment of their fees that

requires money to be run though a mutual fund before paying them for their services, they have

no control over plan assets.  And, according to the Fidelity Defendants, because they can be fired

by Unisys Corporation, their 13-year involvement in the selection and retention of investments in

the Plan was nothing more than a lengthy series of sales negotiations.  ERISA requires the court

to look beyond the surface and at what functions the Fidelity Defendants perform on the Plan's behalf.

**A.     Fiduciary Status Is Based Upon A Fact-Intensive Inquiry That Cannot Be Decided At The Pleadings Stage.**

There are three ways in which a party can become a fiduciary under ERISA:  (1) by being named as a fiduciary in the instrument that establishes the plan, (2) by being named as a fiduciary pursuant to a procedure specified in the plan instrument, including, for example, appointment as a plan investment manager or plan trustee; or (3) by performing one of the functions described in the three subsections of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  *See Glaziers and Glassworkers Local Unions No. 252 Annuity Fund v. Newbridge Secs, Inc*., 93 F.3d 1171, 1179 (3rd Cir. 1996).

Section 3(21) of ERISA provides that a fiduciary is anyone who performs the following functions in connection with an employee-benefit plan governed by ERISA:

> (1) exercises any discretionary authority or control respecting management of such plan,
> (2) has any discretionary authority or responsibility in the administration of such plan,
> (3) exercises any authority or control respecting management of [the plan's] assets,
> (4) exercises any authority or control respecting disposition of [the plan's] assets,

29 U.S.C. § 1002(21)(A)(i), (iii).[7]  A party can also be a fiduciary if he or she "renders investment advice for a fee or other compensation, direct or indirect," with respect to plan assets. 29 U.S.C. § 1002(21)(A)(ii).

Fiduciary status under ERISA § 3(21)(A) does not turn on strict job titles or "formal trusteeship," but rather in "functional terms of control and authority over the plan." *Mertens v Hewitt Assocs.*, 508 U.S. 248, 262 (1993); *Srein v. Frankford Trust Co*., 323 F.3d 214, 220 (3rd

---

[7]     The difference between the two types of fiduciary authority and control is that discretion is specified as a prerequisite to fiduciary status for a person managing an ERISA plan, but the word 'discretionary' is conspicuously absent when the text refers to assets."  *Srein*, 323 F.3d at 221.  *See also IT Corp. v. General Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir.1997).

Cir. 2003).  It is not an "all or nothing concept," *Maniace v. Commerce Bank of Kansas City, N.A.*, 40 F.3d 264, 267 (8th Cir.1994), and a party does not need have to have authority over all aspects of a plan before it can be deemed a fiduciary.  *Arber v. Equitable Beneficial Life Ins. Co.*, 889 F. Supp. 194, 198-99 (E.D. Pa. 1995).  Instead, the "court must ask whether a person is a fiduciary with respect to the particular activity in question." *Maniace*, 40 F.3d at 267.

Functional fiduciary status is therefore a "fact sensitive inquiry and courts generally do not dismiss claims at this early stage where the complaint sufficiently pleads defendants' ERISA fiduciary status." *In re Schering-Plough Corp. ERISA Litig.*, No. 2007 WL 2374989, at *7 (D.N.J. Aug. 15, 2007).  This is true even when the plan documents contain language apparently excluding a party from fiduciary status:

> Furthermore, [the fact] that the Plan Document assigns all fiduciary responsibility for administration of the Plan to the Benefits Committee is of no consequence at this stage of the litigation.  While ERISA requires the written plan document to name at least one fiduciary who is responsible for the operation and administration of the plan, other individuals not named in the written plan document may still qualify as fiduciaries of the plan if they have discretionary authority.

*In re Schering-Plough ERISA Litig.*, 2007 WL 2374989, at * 6 (construing ERISA § 3(21)(A)(iii); denying motion to dismiss).  *See also In re Schering-Plough Corp. ERISA Litig.*, 420 F.3d 231, 242 (3d Cir.2005) (holding that "the merits of the claims of breaches of fiduciary duties involve complex legal and factual questions" and "[a]dditional discovery proceedings ... may clarify the issues ... .").  Similarly, in *Pietrangelo v. NUI Corp.*, No. 04-3223 (GEB), 2005 WL 1703200 (D.N.J. Jul. 20, 2005), the court observed that "determination of a defendant's fiduciary status is a highly fact intensive inquiry."  *Id.* at *5.

Indeed, court after court has concluded that making that fact-intensive assessment of whether a defendant meets this standard is inappropriate when the plaintiff has not yet had the

benefit of discovery.[8]   As one of these courts succinctly explained, "the manner in which each

defendant … operated" remains "something of a black box" prior to discovery.  *Rankin v. Rots,*

278 F. Supp. 2d 853, 879 (E.D. Mich. 2003).  "To expect a plaintiff to be able to turn on the light

and point to the particular individuals who exercised decision making authority is simply too

much to require at" the dismissal stage.  *Id.*   The Court should therefore reject the Fidelity

Defendants' request to determine, prior to completion of discovery, that there exists no set of

facts under which the Fidelity Defendants could be fiduciaries with respect to the Plans.

The Fidelity Defendants rely extensively on *Hecker v. Deere & Company,* 2007 WL

452275 (W.D. Wis. Jun. 21, 2007).  In *Hecker*, the court devoted a single paragraph to its

determination of the fiduciary status of Defendants FMTC and FMRCo,[9] and concluded that

because the Trust Agreement between FMTC and Deere said that Deere had "sole responsibility"

for the selection of the plan's investment options, it must be so, not matter what the plaintiffs

alleged otherwise.[10]   However, ERISA directs courts to look beyond [the fiduciaries'] formal

---

[8]        *In re Cardinal Health, Inc. ERISA Litig.*, 424 F. Supp. 2d 1002, 1030 (S.D. Ohio 2006) ("fiduciary status is
a 'fact-intensive inquiry, making the resolution of that issue inappropriate for a motion to dismiss.'"); *Eslava v. Gulf
Telephone Co.*, 418 F. Supp. 2d 1314, 1322-23 (S.D. Ala. 2006) (declining to dismiss plaintiffs' ERISA claims
based on defendant's "alleged fiduciary status or the parameters of her fiduciary capacities at this stage of the case");
*In re Sprint Corp. ERISA Litig.*, 388 F. Supp. 2d 1207, 1227-28 (D. Kan. 2004) (finding it premature to determine
scope of fiduciary duties and whether particular defendant acted in fiduciary capacity on motion to dismiss); *In re
Xcel Energy, Inc.*, 312 F. Supp. 2d 1165, 1180-81 (D. Minn. 2004) (questions of fiduciary status are ill-suited to
resolution on Rule 12(b)(6) motion); *In re CMS Energy ERISA Litig.*, 312 F. Supp. 2d 898, 907-09 (E.D. Mich. 2004)
(holding fiduciary status could not be determined on a motion to dismiss); *In re Elec. Data Sys. Corp. "ERISA"
Litig.*, 305 F. Supp. 2d 658, 665 (E.D. Tex. 2004) ("It is typically premature to determine a defendant's fiduciary
status at the motion to dismiss stage of the proceedings.").

[9]        FIIOC was not a defendant in *Hecker*.

[10]       The flaw in this reasoning is readily apparent.  For example, the Trust Agreement states, tracking the
language of ERISA § 404, that "no part of the Trust … may be used for, or diverted to, purposes other than the
exclusive benefit of the participants in the Plan … ."  Ct. Doc. 13-15, § 3, at 8.  Does that mean that it was
*impossible* for the Trustee or the Named Fiduciary to divert money from the Trust, simply because the Trust
Agreement specified that it should not be done?  Of course not.  Would a case alleging that the Trustee diverted
money from the Trust be dismissed simply because the Trust Agreement prohibited the Trustee from doing that act?
Of course not.  For the same reason, the mere fact that the Trust Agreement contains language from ERISA
purporting to limit the Fidelity Defendants' roles does not mean that it was *impossible* that the Fidelity Defendants
exceeded the limitations placed upon them.  At the very least, Plaintiffs have alleged that the Trust Agreement did
not describe the practical relationship between the Unisys Defendants and the Fidelity Defendants and seek a chance
to provide the evidence proving this.

authority with respect to the plan … and to consider what real authority they had over plan investments." *Leigh v. Engle*, 727 F.2d 113, 135, n.33 (7th Cir. 1984).  The *Hecker* court completely failed to do this, and this Court should not repeat the error. [11]

**B.      FIIOC is a Functional Fiduciary.**

**1.      FIIOC is a Fiduciary Because It Exercises Control Over the Disposition or Management of Plan Assets.**

Plaintiffs first allege that FIIOC "exercised control over disposition of the plan assets" or that it "exercised control over management of the plan assets" within the meaning of ERISA § 3(21)(A) by agreeing to accept payment for its services primarily in the form of monies that have first been swept through a mutual fund ("revenue-sharing payments").  FAC, ¶¶ 15, 48.  Instead of seeking payment directly from the Plan, FIIOC dealt separately with the mutual fund and/or FMRCo so that the Fidelity Defendants had the ability to control the amount of Plan assets each received in connection for its services.  The Fidelity Defendants, including FIIOC, also controlled which services it was willing to provide and at what price, based on its side-deal with FMRCo and the mutual funds.  FAC, ¶ 13-16, 48-49. [12]

If FIIOC and the other Fidelity Defendants had taken their fees directly from the monies that FMTC held in trust – and if they were able to take as much or as little as they liked as payment for the services they provided – it would be very clear that they were controlling Plan

---

[11]      In response to the *Hecker* decision, the plaintiffs filed a Rule 59 motion, attaching evidence that indicated that FMRCo and FMTC did exercise discretion over plan assets and over the selection of funds in the Deere plan. *See Hecker v. Deere & Co.*, No. 06-C-719-S (W.D. Wis.), Ct. Docs. 104 (motion), 105 (memorandum) and 106 (declaration).  The Rule 59 motion was filed under seal in accordance with the court's protective order and with the *Hecker* defendants' designation of thousands of documents and most of the deposition testimony as "confidential." The motion is still pending.

[12]      Plaintiffs need discovery to determine the exact mechanism that the Fidelity Defendants used to collect and distribute the fees they removed from Plan participants' accounts and distributed among Plan service providers and whether Plan fiduciaries had established proper procedures to secure the return to the Plan of any excess.  *See Pietrangelo*, 2005 WL 1703200, at n.9 ("The Court is mindful that the circumstances of alleged breaches of fiduciary duty can be difficult to identify without the benefit of discovery, often because relevant facts are in the exclusive possession of the breaching fiduciary.")

assets.  *See., e.g., Srein*, 323 F.3d at 221 (discussing control of plan assets).  If FIIOC and the other Fidelity Defendants took one fee directly from the Plan and divided it up among themselves in whatever manner they chose, it would be clear that they were exercising control over the disposition of the Plan's assets.  However, the Fidelity Defendants argue that if those *same* payments are made, after the monies are placed in a mutual fund, they lose their character as "Plan assets" and become assets of the mutual fund.  Mem. at 12-13.  This is not what ERISA says.

ERISA states that when a 401(k) plan invests its assets in a mutual fund, the *mutual funds' assets* do not become plan assets "*solely* by reason of such investment" in the mutual fund. It does not say that *plan assets* automatically become *mutual fund assets*, although that is the reading the Fidelity Defendants would impose on the Court.  A plain reading of the ERISA text makes it clear that the statute does not speak at all to the Fidelity Defendants claim that the statute forbids any determination that monies placed in a mutual fund company could still be "plan assets" for some other reason.  *See* 29 U.S.C. § 1101(b)(1).  And, of course, the statute says nothing about whether monies that came from the Plan and are routed through a mutual fund before being paid to Plan service providers are Plan assets or not.[13]

Only one case has considered the payment of ERISA plan service provider fees from mutual funds – *Haddock v. Nationwide Insurance Co.*, 419 F. Supp. 2d 156 (D. Conn. 2006).  In *Haddock*, Nationwide provided annuities – essentially vehicles for the investment of funds – to retirement plans and their participants.  A plan sponsor would choose the mutual funds to be contained in the group annuity from a short list of funds Nationwide selected.  *Id.* at 161.  In

---

[13]     ERISA itself does not define "plan assets" in this context.  As discussed above, section 401(b) provides only that the assets of a mutual fund company do not become "plan assets" merely by the plan's investment in a mutual fund company, but does not offer any guidance as to what plan assets are.  *See* 29 U.S.C. § 1101(b).  The attendant regulations promulgated by the Department of Labor do not contain any further clarification on this point. *See* 29 C.F.R. 2510.3-101 (plan assets – investments).

exchange for making the mutual funds available to its retirement plan customers, Nationwide

received fees in the form of revenue-sharing payments from the mutual funds, *i.e.*, the mutual

funds "shared" a portion of the fees they received from the retirement plans with Nationwide,

another retirement plan service provider.  The court founds that these revenue sharing fees were

considered "plan assets" even though they were *paid by mutual funds out of mutual fund fees.  Id.*

at 162-63 (describing payments).  The *Haddock* court found that plan service provider fees

would constitute plan assets when a plan service provider holds or receives them (1) as a result

of its status as a fiduciary or its exercise of fiduciary discretion or authority, and (2) at the

expense of plan participants or beneficiaries.  *Haddock*, 419 F. Supp. 2d at 169-70 (citing cases

from which the standard was drawn).[14]

Turning to the specific facts, the Court found that Nationwide came to hold the assets as a

result of its status as a fiduciary, since the selection of the mutual funds for investment by plan

participants was both an exercise of control and the reason that Nationwide was in a position to

receive the revenue-sharing payments.  *Id.* at 170.  The *Haddock* court also found, relying on the

complaint's allegations, that the mutual funds, although charging no more than their standard

expense ratios disclosed in their prospectuses, made sure that those expense ratios included

sufficient funds to make the revenue-sharing payments to Nationwide.  *Id.* at 170.  *Compare*

FAC, ¶¶ 45-49.

Nationwide was able to ensure that the retirement plans who were its customers only

chose funds that would make revenue sharing payments to Nationwide.  *Id.* at 166-67.  It

separately "negotiated" the amount of those revenue-sharing payments with the mutual funds.

Plaintiffs allege that FIIOC, FMRCo, FMTC and/or another of the Fidelity Investments

---

[14]     The *Haddock* court noted the existence of a "documentary test," in which the court looks to the contract to
see how the parties characterized the funds.  *Id.* at 168.  However, in *Haddock*, just as here, the contract was silent.

companies did exactly the same thing here.  The contract with Unisys limited the funds to be available to Plan participants so that only funds (Fidelity-branded funds) that would make revenue sharing payments to FIIOC would be included in the plan.  FIIOC separately negotiated the amount of those revenue-sharing payments with the mutual funds or with one or more of the Fidelity Defendants or other Fidelity Investments companies.  The fact that the monies had been routed through the mutual funds before making their way to Nationwide was of no relevance to the *Haddock* court's inquiry and should be of no relevance here.[15]

The *Haddock* court also found that Nationwide had profited at the expense of the plan, by collecting the revenue-sharing payments from inflated expense ratios.  *Id.* at 170.  Likewise, FIIOC used its control over the disposition of Plan assets to collect excessive administrative fees – fees which did not reflect the actual cost of administrative services supplied to the Plans – out of the participants' retirement funds.  *Id.*  See FAC, *¶¶* 53-54.  Had FIIOC not removed these excess fees from the Plan, these monies would have been available to earn investment gains and provide additional income to participants when they retire.  *See Siemers,* 2007 WL 760750, at *13.

In a related context, the Second Circuit has held that "plan assets" do not lose their character as such merely because they change hands.  In *U.S. v. Glick*, 142 F.3d 520 (2d Cir. 1997), Glick, an insurance broker, enrolled plan participants in a health insurance plan in exchange for a commission.  Glick himself determined the amount of his commission and took it out of the money to be paid to the plan. Glick also used his commissions to pay bribes to the plan's sponsor for steering business his way.  After being convicted of bribery for paying these

---

[15]        A further elaboration of these principles, albeit in a different context, can be found in *Siemers v. Wells Fargo & Co.*, No. C-05-04518 WHA, 2007 WL 760750, at * 8, * 11  (N.D. Cal. Mar. 9, 2007) (noting use of mutual fund assets disguised as investment adviser fees as a "conduit" to make revenue-sharing payments to its affiliates and others).

kickbacks to the plan sponsors, Glick challenged his sentence, arguing that he himself could not be considered an ERISA fiduciary because his commissions were his own monies, not "plan assets" over which he exercised control. *Glick*, 142 F. 3d at 523-24. The Second Circuit disagreed with Glick's characterization of his commissions as his own money and not the plan's. In finding that Glick exercised control over plan assets and was thus a fiduciary, the Second Circuit observed that just as "the monies an employer actually pays over to the welfare plan, directly or indirectly and regardless of whose control such monies passes, constitutes welfare plan assets from the time the employer parts with the monies," it is "reasonable to conclude that the monies retain their character as fund assets as they pass downstream … ." *Id.* at 527. Here, too, the "plan assets" simply passed downstream when they were routed from the Plan trust to one Fidelity entity and then again to another.

The Fidelity Defendants urge the Court instead to adopt the reasoning of *Chicago District Council of Carpenters Welfare Fund v. Caremark,* 474 F.3d 463 (7th Cir. 2007) with regard to its definition of "plan assets." Mem. at 21-22. In *Caremark*, a pharmacy benefits case, the health insurance plan sponsor (Carpenters) entered into a contract with a "pharmacy benefits manager" (Caremark) in which the parties agreed that Carpenters would pay set prices for prescription drugs. These prices were based on factors entirely beyond the control of Caremark (or Carpenters, for that matter). Caremark also agreed to pay Carpenters a rebate of $1.50 or $.75 per prescription filled, regardless of the price of the prescription or the percentage of the rebate Caremark itself received from the drug makers.[16] The Seventh Circuit found that under these circumstances, and based on the specific contractual terms, where the parties specifically negotiated a set amount of rebates that Caremark (not the drug maker) was obligated to pay the

---

[16]     One version of the contract also noted the existence of "financial relationships" that Caremark had with drug makers and further noted that Caremark "may receive rebates" from these drug makers.

plan, Caremark did not exercise fiduciary control of plan assets when it retained rebates that it negotiated on its own behalf with drug makers instead of passing the savings along to Carpenters.

Unlike *Haddock* and *Glick*, each of which contained an extensive discussion of the statutory term "plan assets," the *Caremark* court refers to "plan assets" only in passing footnote. *Caremark*, 474 F.3d at n.6.  The court observed, if Caremark *had* agreed to collect the same rebates and pass them through to Carpenters, instead of agreeing to accept a flat, pre-determined rate for its services, the rebates would have been considered "plan assets."  Thus, in *Caremark*, if the percentage of the rebates to be passed along to the plan was not the subject of negotiation but was unilaterally determined by Caremark, then Caremark would have clearly been exercising control over those assets.

Plaintiffs allege that this case presents just that situation.  Unlike the detailed contract in *Caremark*, in which all parties had an understanding of the rebate system and all parties understood how Caremark would be paid.  Because Carpenters knew about the rebates, it could have negotiated to have the actual amount of the rebates passed through instead of only a portion of the rebates.  Having made that agreement, Carpenters could not use the courts to re-draft the contract.  But that is not what happened here.  Here, the Trust Agreement between FMTC (and its delegate, FIIOC) and Unisys make no mention of any "rebates" or revenue sharing payments.  Instead, it indicates that the only money FIIOC and FMTC will receive for their services are those sums set forth on Schedule B of the Trust Agreement, as amended.  *See, e.g.,* Trust Agreement, Ct. Doc. 13-5, at 35 ($10 per quarter), 38 (describing services).  If Unisys knew that the record-keeper was receiving payments from another source that would dwarf the explicit fees it agreed that the participants would pay, there is no hint in the Trust Agreement.  In addition, while the *Caremark* court found it relevant that Carpenters received exactly what it had

negotiated – pharmacy benefits at a price it chose — and while the court found that the money

Carpenters agreed to pay for those benefits was delivered to the identified parties supplying those

benefits, that is not what happened here.  For the situation here to be analogous, Caremark would

have had to have diverted some of the money earmarked by Carpenters to purchase medications

or pharmacy benefits services to a Caremark affiliate in order to cover administrative expenses,

without telling Carpenters in advance that it planned to do so.  Further, the amount diverted

would have to increase every year, so that it bore no relation to the amount or type of

administrative services provided to the Carpenters' plan.  Nothing of the sort happened in

*Caremark*, but that is what Plaintiffs allege happen here.  *Caremark* is neither controlling nor

persuasive.

> ## 2. FIIOC Is A Fiduciary Because, In Practice, It Exercises Authority Over The Selection Of The Plans' Investments.

Plaintiffs allege that FIIOC "plays a role in the selection of investment options."  FAC, ¶

15.  A party who decides which investment options will be included in a plan is unquestionably a

fiduciary because he or she exercises "authority or control" with respect to the "management or

disposition" of plan assets pursuant to ERISA § 3(21)(A)(i).  *See, e.g., Johnson v. Georgia-*

*Pacific*, 19 F.3d 1184, 1189 (7th Cir. 1994).

Such authority does not have to be absolute – the statute itself makes it plain that *any*

authority or control over plan assets is sufficient.  ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(A)(i)

(a plan fiduciary is one who "exercises *any* control or authority respecting the management or

disposition of [a plan's] assets …") (emphasis added).  Influence or indirect control is sufficient.

*See Brock v. Hendershott*, 840 F.2d 339, 342 (6th Cir. 1988) (party who "wielded considerable

influence" over the actual trustees was fiduciary); *Blatt v. Marshall and Lassman*, 812 F.2d 810,

812 (2d Cir. 1989) (parties who delayed sending off the paperwork necessary for the plan

participant to receive money from the plan exercised control over plan assets); *Stanton v. Shearson/Lehman American Express, Inc.*, 631 F. Supp. 100, 105 (N.D. Ga. 1986) (broker was a fiduciary, exerting indirect control over the plan assets through its supervision of the party with actual control over the plan assets).

The Fidelity Defendants insist that FIIOC (or any of the other Fidelity Defendants) could not have *any* authority or control over the selection of the Plans' funds because one or more of the Unisys Defendants had final authority over the inclusion of funds in the Plan according to the Trust Agreement. Mem. at 22. But that is not the critical issue. What Plaintiffs have alleged, and their allegations must be taken as true, is that *in practice* FIIOC "played a role" in the selection of the 70+ Fidelity-branded funds. FAC, ¶¶ 15, 26-27. FIIOC's role, either alone or in conjunction with another Fidelity Investments entity,[17] was to create a short list of funds, out of all of the funds allowed under the Plan,[18] for the Unisys Defendants' consideration. The Unisys Defendants provided no guidelines for this limiting pre-selection, and the contract does not address how this was to be accomplished. By limiting the universe of available funds to those from which they knew were able to make sufficient revenue-sharing payments, FIIOC and/or FMTC could ensure control over the amount of revenue sharing payments they would receive. Further, by being paid FIIOC through revenue sharing instead of directly from the Plan, FIIOC and/or FMTC made the explicit fees it charged the Plan under the Trust Agreement appear to be the only fees collected, and made their services appear to be a bargain.

---

[17] The Trust Agreement states only that "the Trustee" shall have no responsibility for the "selection of investment options under the Trust" and that "the Trustee" shall not "render investment advice." Trust Agreement, Ct. Doc. 13-5, § 5(a), at 5. However, the Trust Agreement is silent as to the role that FIIOC, FMRCo or other Fidelity Investments companies may play in this regard.

[18] For example, the financial website Morningstar.com lists more than 200 mutual funds in the "Fidelity Fund family."

The *Haddock* court recognized such pre-selection of investment options as an exercise of control over the disposition of plan assets.  The *Haddock* court found that even though plan service provider Nationwide merely offered a list of funds to the plan's sponsors and did not make the decision either to select mutual funds for the plan or to invest the contributions in particular mutual funds, it nonetheless did "exercise some control over the selection of mutual funds that are available for the Plans' and participants' investments."  *Haddock*, 419 F. Supp. 2d at 166.  Because such a degree of control enabled the plan sponsor to select only mutual funds that paid the Nationwide sufficient revenue-sharing payments, it was sufficient for the *Haddock* court to conclude that Nationwide was a fiduciary, at least with regard to the selection of mutual funds.  *See id.* & n.6.

The *Haddock* court found the U.S. Department of Labor's Advisory Opinion 97-15A (May 22, 1997) helpful in reaching its conclusion.[19]  The Department of Labor was presented with a question from Frost National Bank, a plan service provider who entered into agreements with certain mutual fund advisers and distributors.  In accordance with those agreements, Frost made mutual funds from these mutual fund families available to the plans it served, in exchange for revenue sharing payments from those fund families which Frost used to defray plan record-keeping fees.  Although the plan fiduciaries "independently" chose the funds made available to plan participants, Frost vetted the mutual funds before entering into agreements with the fund families and retained the authority to add or eliminate mutual fund families.  *Id.* at *3.  The Department noted: "Under these circumstances, we are unable to conclude that Frost would not exercise any discretionary authority or control to cause the Plans to invest in mutual funds that pay a fee or other compensation to Frost."  *Id.* at *4.

---

[19]     The Supreme Court has given its seal of approval to reliance on such DOL guidance.  *See, e.g., Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon*, 541 U.S. 1, 18 (2004) (the "Department's opinion reflects a 'body of experience and informed judgment to which courts and litigants may properly resort for guidance'").

The Department of Labor also provides a limited exception to this general rule. When a plan service provider that retains the authority to add, delete or substitute mutual funds gives advance notice to the plan fiduciaries of the change, including any increase in record keeper or other administrative fees caused by the change, and a chance to reject the change by selecting a new service provider, and when the plan fiduciaries actually make the decision to ratify or reject the change, that service provider will not be considered a fiduciary under those circumstances. DOL Adv. Op. 97-16A at 4 (May 22, 1997); DOL Adv. Op. 03-09A at 4 (June 25, 2003).

The Fidelity Defendants argue that because the Trust Agreement allows either party to terminate it upon 60 days notice, Plaintiffs cannot show that FIIOC or any of the other Fidelity Defendants was a fiduciary.  *See* Mem. at 16 (referring to Trust Agreement, Ct. Doc. 13-5, § 11 at 24).  However, the fact that the Unisys Defendants may have been free to terminate the Trust Agreement does not mean that FIIOC satisfied the other part of the exception – notifying the Unisys Defendants of any changes in its compensation caused by a change in the funds made available.  The determination of whether any particular arrangement qualifies for this exception is an "inherently factual" question, *see id.*, and hence not appropriately answered on a motion to dismiss.  Nothing in the materials before the Court suggests that it happened in this manner, and Plaintiffs are to be given the benefit of the doubt at the pleading stage.

### 3.   **FIIOC is a Fiduciary Under ERISA § 3(21)(A)(ii).**

In its role as record-keeper and administrator, FIIOC also supplies the Unisys Defendants with "investment advice regarding the disposition of moneys in the Plan" as described in ERISA § 3(21)(A)(ii), 29 U.S.C. § 1002(21)(A), and its implementing regulations, found in 29 C.F.R. § 2510.3-21(c).  Under this provision, a party is deemed a fiduciary when it renders "individualized" investment advice to an employee benefit plan on a regular basis, pursuant to

some type of mutual understanding with one of the plan's fiduciaries, and when such advice serves as a primary basis for the investment decisions regarding plan assets.  29 C.F.R. § 2510.3-21(c)(ii)(B).

FIIOC's "role in the selection of funds," (FAC, ¶ 15), satisfies the requirements of ERISA § 3(21)(A)(ii).  First, Plaintiffs claim that the Fidelity Defendants sold the Fidelity Investments 401(k) plan services as a type of "one-stop-shopping" for all of a plan sponsor's 401(k) needs.  FAC, ¶¶ 25-30, 48 (describing roles of multiple Fidelity Investments companies).  They held themselves out as experts in the operations of such retirement plans and the Unisys Defendants uncritically accepted their advice.  *See* FAC, ¶¶ 26-27 (observing that over 13 years, the Unisys Defendants continued to limit their selection of investment options in the Plan to Fidelity-branded investments and "selected" 70 + of those investments).  Plaintiffs allege that this indicates that the Unisys Defendants uncritically accepted FIIOC's or FMTC's input, and rubber-stamped whatever the Fidelity Defendants wanted.  *See Johnston v. Exelon Corp.*, No. 04-4040, 2005 WL 696896, at * 4 (E.D. Pa. Mar. 23, 2005) (where company executives made decisions which were "rubber stamped" by the ERISA plan's named fiduciaries, executives themselves were fiduciaries; denying motion to dismiss); *Procacci v. Drexel Burnham Lambert*, No. 89-0555, 1989 WL 121984 (E.D. Pa. 1989) (same).[20]  As such, the Fidelity Defendants, including FIIOC, were fiduciaries with respect to the Plan.

---

[20]     The *Procacci* court cited ERISA's legislative history for this principle:

The term "fiduciary" ... includes any person who renders investment advice for a fee … .  While the ordinary functioning of consultants and advisers to employee benefit plans (other than investment advisers) may not be considered as fiduciary functions, it must be recognized that there will be situations where such consultants and advisors may because of their special expertise, in effect, be exercising … some authority or control regarding [plan] assets.  In such cases, they are to be regarded as having assumed fiduciary obligations within the meaning of the applicable definition.

*Procacci*, 1989 WL 121984, at * 5 (quoting House Conference Rep. No. 93-1280, 93rd Congress, reprinted in 1974 U.S. Code Cong. & Admin. News 4639, 5038, 5103.).

Plaintiffs believe that FIIOC regularly provided information to the Unisys Defendants about the performance and other qualities of the Fidelity-branded mutual funds and the other Fidelity funds in the Plan that was intended to serve as the Unisys Defendants primary basis for investment decision making.[21]  FIIOC provided these services with an eye toward ensuring that the Fidelity-branded funds remained investment options, and successfully kept scores of Fidelity-branded investment options in the Plan over the last 13 years.  Also in its role as record-keeper/administrator, FIIOC assists the Unisys Defendants in selecting new investments, again with an eye to ensuring a continued Fidelity presence in the Plan, and again, successfully, since the Plan has added only new Fidelity-branded investments over the last 13 years.

All of FIIOC's recommendations were made on an "individualized" basis, since FIIOC as record-keeper and administrator is familiar with the "particular needs of the plan regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments."  29 C.F.R. § 2510.3-21(c)(ii).  Finally, FIIOC receives payment for these services in the form of administrative and record-keeping fees; fees which, being computed on a percentage basis, increase as the amount of money invested by the Plan in Fidelity-branded funds increases.  FAC, ¶¶ 45, 53.

The Fidelity Defendants claim that the large number of Fidelity-branded funds in the Plan is the product of salesmanship, and that the Unisys Defendants were able to simply ignore any "suggestions" for products that FIIOC might have made and terminate the contract at any time.[22]

---

[21]     The almost yearly amendments to the Trust Agreement adding and/or changing the names of the funds and/or the duties to be performed by FMTC and FIIOC certainly suggest that the parties met "regularly."  *See* FAC, ¶ 27 (noting 16 amendments in 13 years); Ct. Doc. 13-5, at 34 (1997); 35, 41 (1998); 42 (2002); 43 (2004); 45 (2005); 48 (2006).

[22]     For example, they cite *Marks v. Independence Blue Cross*, 71 F. Supp. 2d 432, 436 (E.D. Pa. 1999) to argue that FMTC simply drove a hard bargain with the Unisys Defendants when it insisted that Plan assets be invested only in FMRCo-managed mutual funds and other Fidelity-branded investments.  Mem. at 11.  In *Marks*, the court cited *Schulist v. Blue Cross of Iowa*, 717 F.2d 1127 (7th Cir. 1983) for the principle that at the outset of a contractual relationship, when a plan service provider is negotiating the terms of its initial contract with the plan

*See* Mem. at 16.  At least one court has rejected such argument, made in the context of an ERISA

plan.  In *Ellis v. Rycenga Homes, Inc.*, 484 F. Supp. 2d 694 (W.D. Mich. 2007), the defendant

argued that its advice was mere salesmanship, and that the plan fiduciary was free to reject any

advice received.  However, in ruling on cross-motions for summary judgment, the *Ellis* court

observed:

> Defendant's attempt to characterize this twenty-year history as a
> series of sales pitches, followed by the trustee's decision to accept
> or reject the security being touted by the salesman, is unsupported
> by the record and could not be accepted by any rational trier of fact.

*Ellis*, 484 F. Supp. 2d at 709.

It is equally ridiculous to assume as a matter of law that a 13-year relationship in which the

Unisys Defendants never chose any investments other than those offered by the Fidelity

Defendants' affiliates, and never bought any services of any kind, other than those provided by

the Fidelity Investments companies, was no more than a similar series of sales pitches, similar to

the type the Fidelity Defendants would make at arm's length to potential clients.

The Fidelity Defendants also argue that because the Trust Agreement gives one or more

of the Unisys Defendants the final responsibility for investment decisions, FIIOC cannot be a

fiduciary.  Mem. at 14, 16.  However, the ERISA regulations do not require that FIIOC's advice

be the *only* primary basis for investment decision-making.  *See Ellis*, 484 F. Supp. 2d at 709.

---

sponsor, it is not a fiduciary.  However, *Schulist* does not foreclose the possibility that an entity that started out
bargaining at arm's length for favorable terms, could end up a fiduciary.  *Schulist*, 717 F.2d at 1131-32.  When a
plan service provider has complete control over the factors that determine the amount of its fees, as FIIOC does here,
so that it essentially sets the terms of its own compensation, that party will be deemed a fiduciary, even if that
control was a term of the contract in the first place.  *See F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d
1250, 1258 (2d Cir. 1987); *Morrell & Co. v. John Hancock Mut. Life Ins. Co.*, No. 85 C 9166, 1988 WL 58619, at *
1-2 (N.D. Ill. May 31, 1988); *Sixty-Five Security Plan v. Blue Cross & Blue Shield*, 583 F. Supp. 380, 387-88
(S.D.N.Y. 1984), *disavowed on other grounds by Nobile v. Pension Committee of Pension Plan for Employees of
New Rochelle Hosp.*, 611 F. Supp. 725 (S.D.N.Y. 1985).  The Trust Agreement required Unisys to agree that only
Fidelity funds would be made available to the Plan, so that FIIOC could be paid with revenue sharing, and in so
doing gave FIIOC complete discretion over the amount of the revenue-sharing payments it would receive and thus
how much it would be paid for its services to the Plans.  In doing so, FIIOC was rendered a fiduciary.

Moreover, Plaintiffs have alleged that the only parties involved in the investment decisions were the Defendants, and that the Unisys Defendants followed the Fidelity Defendants' lead, selecting only Fidelity-pre-approved products and investments for inclusion in the Plan.  *See* FAC, ¶ 27. *Compare Ellis*, 484 F. Supp. 2d at 709 (facts indicated that broker was the only source of investment advice for entire 20-year history of the plan).  For this reason as well, FIIOC is a fiduciary to the Plan.

   **C.     FMTC is both a Named Fiduciary and a Functional Fiduciary.**

As the Fidelity Defendants admit, the Trust Agreement clearly specifies that FMTC is a fiduciary in its role as trustee.  Mem. at 13.  The Fidelity Defendants argue, however, that Plaintiffs have not alleged any breach of its duties as trustee, and thus do not state a claim.  Mem. at 13-14.

But Plaintiffs do allege breaches of fiduciary duty in connection with FMTC's role as trustee.  As the Trust Agreement makes clear, by virtue of its role as trustee, FMTC's consent was required before any new investment option could be added to the Plan.  Ct. Doc. 13-5, § 5(b) at 10.  Thus, it clearly "played a role in the selection of investment options" that was connected with its role as trustee.

Plaintiffs have also alleged that "Plan service providers," including FMTC (or an affiliate), are able to use plan assets to earn interest and generate fees on "monies awaiting investment or redemption."[23]  FAC, ¶ 56.  The DOL has made it clear that when a fiduciary, such as a custodian of plan assets like FMTC, uses the interest generated from the float for its own purposes, it operates as a fiduciary *and* engages in a prohibited transaction.  DOL Adv.Op.,

---

[23]     This is known as the "float."  An example of "float" would be when a participant withdraws money from a benefit plan and the plan sends the participant a check.  During the period between the time the funds are placed in the account on which the check is written and the time the participant presents the check, the money can be earning interest.  The participant does not receive the interest; he or she only receives the amount of money indicated on the check.

93-24A (Sept. 13, 1993).  Absent full disclosure to the plan fiduciaries, which Plaintiffs allege

did not occur (FAC, ¶¶ 57-58), this is considered prohibited self-dealing and a violation of

ERISA.  *Id.  See also* DOL Letter, Robert J. Doyle of Director of Regulations and Interpretations,

to Ms. Judith A. McCormick, Federal Counsel, American Bankers Association, (August 11, 1994)

(noting that a custodian that kept the float for its own use without "full disclosure" to the other

plan fiduciaries and that controlled the flow of the money would violate § 404(a)(1)(A), the duty

to act prudently and solely in the benefit of the participants).

Further, FMTC, like FIIOC above, is paid for its trustee/custodial duties through the

receipt of revenue-sharing money.  For the same reasons that FIIOC is a fiduciary, as described

in section II.B.1 above, FMTC is similarly a fiduciary.  And, while Plaintiffs believe that FIIOC

was the Fidelity entity responsible for providing investment advice and influencing the selection

of funds as described above in sections II.B.2 and 3, it may have been FMTC instead, despite the

language of the Trust Agreement.  The relationships among the Fidelity Defendants and their

affiliates are still within the "black box" of pre-discovery.  *See Rankin*, 278 F. Supp. 2d at 879.

Finally, FMTC is liable as a co-fiduciary under ERISA § 405, 29 U.S.C. § 1105.  It has

acknowledged that nothing in the Trust Agreement would exempt it from such co-fiduciary

liability.  Trust Agreement, Ct. Doc. 13-5, § 8(d) at 23.  Section 405 provides that a fiduciary is

liable for the breaches of its co-fiduciaries when a fiduciary participates knowingly in another

fiduciary's breach, when a fiduciary breaches its own duties and thus enabled another fiduciary

to commit a breach or when a fiduciary has knowledge of a breach by such other fiduciary and

makes no reasonable efforts to remedy the other's breach.  29 U.S.C. § 1105(a)(1)-(3).  To the

extent that FMTC knew of the Unisys Defendants' breaches and knowingly participated in them

and/or made no efforts to stop them, it is open to liability under this section.

### D.    FMRCo is a Functional Fiduciary.

The Fidelity Defendants argue that FMRCo cannot be a fiduciary because it is an investment adviser to the Fidelity-branded mutual funds.  Mem. at 12.  However, ERISA does not immunize all mutual fund advisers from fiduciary liability no matter what the circumstances.  Instead, it provides that a mutual fund investment adviser does not become a fiduciary *solely* because of its role as mutual fund investment adviser.  29 U.S.C. § 1002(21)(B).  Thus, while FMRCo is not *automatically* deemed a fiduciary, ERISA contemplates that an entity may perform more than just a single function with respect to a plan.  FMRCo can be, and is, a fiduciary under ERISA §3(21)(A)'s other provisions.  *See* 29 C.F.R. § 2509.75-3 (if an investment adviser to a mutual fund is a fiduciary or party in interest for reasons other than the investment in the mutual fund, the adviser remains a fiduciary).[24]

Finally, although it is only a minor part of the FAC (paragraphs 63-67), Plaintiffs  note that the Fidelity Defendants devote significant space to their argument that they owed no duty to disclose information about their revenue-sharing program to the participants, not only because none of them are fiduciaries, but also because the information Plaintiffs identify about administrative costs and comparative costs is not important and not required by law to be disclosed to the participants.  Mem. at 16-20.  The Fidelity Defendants argue that they were under no obligation to tell Plan participants anything that is not required by ERISA and that their intra-Fidelity revenue-sharing arrangements are the sort of immaterial information the DOL does

---

[24]     The cases the Fidelity Defendants cite are not to the contrary.  Mem. at 13.  Although recognizing that a mutual fund investment advisor is not automatically deemed a fiduciary, both cases explain that such advisers may be fiduciaries for other reasons.  *A. Ronald  Sirna, Jr., P.C. Profit Sharing Plan v. Prudential Secs., Inc.*, 964 F. Supp. 147, 149 (S.D.N.Y. 1997) (the investment of plan assets in "securities issued by a registered investment company *does not of itself* cause the investment company [or] its adviser" to become an ERISA fiduciary) (emphasis added); *Corbett v. Marsh & McLennan Cos.*, No. MDL 15863, 2006 WL 734560, at *2 (D. Md. Feb. 27, 2006) (mutual fund investment adviser could be considered provider of "investment advice" and thus a fiduciary, although complaint failed to plead such facts).

not require to be disclosed.  Mem. at 16-17.[25]

First, as discussed below in III.A.1, the requirements of ERISA do not set the outer bounds of an ERISA fiduciary's duty to be truthful, and compliance with ERISA does not absolve a fiduciary of liability for making dishonest statements or omissions.  *See In re Unisys Corp. Retiree Medical Ben. ERISA Litig.*, 57 F.3d 1255, 1263 (3rd Cir. 1995) ("satisfaction by an employer as plan administrator of its statutory disclosure obligations under ERISA does not foreclose the possibility that the plan administrator may nonetheless breach its fiduciary duty owed plan participants to communicate candidly").

The Fidelity Defendants also claim that the information they failed to disclose was too trivial to matter.  Citing *Horvath v. Keystone Health Plan East, Inc.*, 333 F.3d 450 (3rd Cir. 2003), they argue that because a participant's only options were to participate in the Plan or else forego the 401(k) savings opportunity entirely, no information about the Plan or the fees could be possibly be material.  Mem. at 19.  *Horvath* involved a health insurer who did not disclose information about how doctors in its network were compensated.  The defendant in fact did make such information available, but the plaintiff never asked for it– a fact the court found significant in denying relief, since it would have triggered a duty to disclose.  333 F.3d at 462-63.[26]  And, although the court found that in the plaintiff's case such information was immaterial, the court concluded that a plaintiff who was injured because a doctor provided inadequate care as a result

---

[25]     Although not addressed by the Fidelity Defendants, the Plaintiffs have other claims involving misrepresentations or a failure to disclose.  For example, Plaintiffs explained in their Memorandum in Support of Motion for Relief Pursuant to Rule 56(f) how the disclosures about fees in the Summary Plan Description are misleading and how they fail to provide the information required by § 404(c) and its regulations.  Ct. Doc. 21 at 8-9.  *See also* FAC, ¶ 63.B.  According to the Trust Agreement, the responsibility for preparing the Summary Plan Description was shared by FMTC/FIIOC and the Unisys Defendants.  Ct. Doc. 13-5, at 37.

[26]     Of course, here, Plaintiff Renfro did ask for the information and was not given it.  *See* Ct. Doc. 12-11 at 3.  In fact, he was told that "Fidelity does not receive any compensation for performing the record keeping function.  It receives its compensation for providing the mutual funds etc."  (Letter from Michael Lapetina, dated November 21, 2006, submitted by the Unisys Defendants in support of their Motion for Summary Judgment).

of the insurer's compensation methods *could* bring suit, including a suit for medical malpractice. *Id.* at n.11.  It is that second type of action which is similar to Plaintiffs' claims here; Plaintiffs allege that the Plan paid unreasonable and excessive expenses, which were in part a consequence of the revenue-sharing scheme, whether or not Plaintiffs were ever told about its existence.

## III.    PLAINTIFFS' OTHER CLAIMS ARE ALSO ADEQUATELY PLEADED   AND DO NOT DEPEND ON THE FIDELITY DEFENDANTS' FIDUCIARY STATUS.

### A.    Count II States A Claim.
#### 1.    Count II States a Claim, Even If, Assuming *Arguendo*, The Fidelity Defendants Are Not Fiduciaries.

The Fidelity Defendants argue that Count II must also be dismissed because they are not fiduciaries.  Mem. at 23.  Plaintiffs have explained above the reasons that the Fidelity Defendants are fiduciaries and will not repeat it here.  More importantly, the Fidelity Defendants' liability under § 502(a)(3) in Count II does not hinge on their fiduciary status.  For example, to the extent that the Fidelity Defendants participated in prohibited transactions with the Unisys Defendants, they can be liable under § 502(a)(3), even if they are not fiduciaries.  *See Harris Trust & Sav. Bank v. Salomon Smith Barney*, 530 U.S. 238, 247-48 (2000); 29 U.S.C. §§ 1109, 1132(a)(2); *Reich v. Compton*, 53 F.3d 270 (3rd Cir. 1995).  Plaintiffs have alleged such transactions.  FAC, ¶ 53-58, 73-78.  However, the Fidelity Defendants claim that Plaintiffs have made the Fidelity Defendants' fiduciary status a predicate to their claims in Count II because their legal theories in that count are premised on that fiduciary status.  Mem. at 23.  It is the plaintiff's prerogative to plead in the alternative, even if the pleadings are inconsistent. *See Indep. Enters. Inc. v. Pittsburgh Water & Sewer Auth.*, 103 F.3d 1165, 1175-76 (3d Cir.1997).  The Federal Rules make this clear:  "[a] party may [ ] state as many claims or defenses as the party has regardless of consistency... ."  Fed. R. Civ. P. 8(e)(2).  Thus, the Plaintiffs can plead both that the Fidelity Defendants are fiduciaries, and alternatively, that they are not.

Allegations that the Fidelity Defendants are fiduciaries therefore do not preclude liability under an alternative theory in the event that they are not fiduciaries.  Such alternative pleading is not only appropriate, but necessary in this case precisely because the Fidelity Defendants have made it very difficult for Plaintiffs to know for certain not only the intricate corporate structure of the privately owned Fidelity entities but also the nature of the Fidelity Defendants' involvement in the selection of funds and the determination and allocation of fees.  The mere fact that the Plaintiffs allege the Fidelity Defendants may be fiduciaries does not require dismissal of Count II, even if the Fidelity Defendants are *not* fiduciaries.

### 2. Count II States a Claim for Appropriate Equitable Relief.
#### a. Count II is Not Redundant.

The Fidelity Defendants also seek dismissal on the ground that Count II allegedly does not seek "appropriate equitable relief," the type of relief authorized by § 502(a)(3).  Mem. at 23-25.  More particularly, the Fidelity Defendants argue that the relief that Plaintiffs seek, although mainly equitable, is not "appropriate."  Mem. at 23.

In *Varity Corp. v. Howe*, 516 U.S. 489 (1996), the Supreme Court explored the meaning of § 502(a)(3)'s requirement that the equitable relief be "appropriate."  The Court explained that § 502(a)(3) is a "catchall" provision, designed to "act as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy."  *Id.* at 512.  The Court therefore concluded "that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'"  *Id.* at 515.  Although this latter statement did not expressly reference *§ 502* as the source of the alternative "adequate relief," such reference was implicit given the Court's earlier reference to § 502 and its citation to three other Supreme Court decisions, each of which similarly focuses on the interplay of various

33

sections of ERISA.  *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 54 (1987) (describing

ERISA § 502(a) as a "comprehensive civil enforcement scheme" and concluding that "ERISA's

civil enforcement remedies were intended to be exclusive"); *Mertens,* 508 U.S. at 263-64

(recognizing a tension in ERISA between the primary goal of benefiting employees and the

subsidiary goal of containing pension costs, and refusing to "adjust the balance between those

competing goals that the text adopted by Congress has struck"); *Massachusetts Mutual Life Ins.

Co. v. Russell* 473 U.S. 134, 144, 147 (1985) (expressing reluctance to tamper with ERISA's

carefully crafted enforcement scheme).

At any rate, it cannot be determined as a matter of law at this stage of the pleadings that

the relief sought in Count II will duplicate the relief available under other parts of § 502.

Because § 502(a)(3) will provide Plaintiffs' their only avenue for relief under ERISA if the

Fidelity Defendants ultimately prove they are *not* fiduciaries, it will not be duplicative.  And,

since Defendants' fiduciary status cannot be resolved at the pleading stage (*see supra* at II.A),

whether the relief that Plaintiffs seek under § 502(a)(3) replicates the relief available under §

502(a)(2) cannot be determined at this time, either.

Resolution of this issue at the pleading stage is inappropriate for the additional reason

that the Supreme Court has merely stated that duplicative relief under § 502(a)(3) would "likely"

and "normally" be inappropriate, but did not categorically bar such relief.  *See Varity Corp.,* 516

U.S. at 515 ("we should expect that where Congress elsewhere provided adequate relief for a

beneficiary's injury, there will *likely* be no need for further equitable relief, in which case such

relief *normally* would not be 'appropriate.'")  Thus, the Supreme Court has not foreclosed the

recovery of relief under § 502(a)(3), even though also available under another subsection, in

*some* circumstances.  The issue of what circumstances these are is an inherently factual question

in each case, making it inappropriate to dismiss before those facts are developed.  The time to determine whether the relief Plaintiffs seek under § 502(a)(3) is "appropriate" is therefore only after discovery and full development of the case, not at the pleading stage.  *See, e.g., DeGuiseppe v. Vertis, Inc.,* No. 04-4348, 2005 WL 2271865, *4 (E.D. Pa. Sept. 15, 2005) (plaintiffs can pursue legal claims under § 502(a)(2) and equitable claims under § 502(a)(3) at the same time at the motion-to-dismiss stage); *Chapro v. SSR Realty Advisors, Inc. Severance Plan*, 351 F. Supp. 2d 152, 156 (S.D.N.Y. 2004) (refusing to dismiss § 502(a)(3) claim duplicative of § 502(a)(1) claim "at [motion to dismiss] stage of the case"); *Communications Workers of America, AFL-CIO v. Nynex Corp.*, No. 93 Civ. 3322 (LMM), 1998 WL 85323, at *1 (S.D.N.Y. Feb. 26, 1998) ("[e]ven if the claims are duplicative, no binding authority has held that a plaintiff cannot *plead* both claims.") (emphasis added).

> **b.    Count II's equitable remedies are not preempted by the federal securities laws.**

The Fidelity Defendants also argue that Plaintiffs' requested relief of an accounting and/or surcharge would be duplicative and contrary to the "express statutory regimes" already in place for mutual funds. Mem. at 23-24.  They claim that if the Court ordered the Fidelity Defendants to explain and account for how the Plan participants' money was used, as a one-time remedy in this case, such disclosures *might* be more extensive than those required by the ERISA statute and regulations or by the regulations governing mutual funds in general.[27]

This same legalistic argument was made by the defendant in *Varity,* which claimed that its fiduciary duty to provide information was limited to "the specific disclosure provisions of ERISA, [and] the specific terms of the plan instruments …"  so that it was under no obligation to

---

[27]    The six non-mutual fund Fidelity options (FAC, ¶ 29) in the Plan are not subject to these "express statutory regimes" nor is the Unisys Stock Fund (FAC, ¶ 30).

say anything else.  *Varity v. Howe*, 516 U.S. 489, 504 (1996).  The Supreme Court could not

have been clearer when it dispatched that argument, writing:

> the primary function of the fiduciary duty is to constrain the
> exercise of *discretionary* powers which are controlled by no other
> specific duty imposed by the trust instrument or the legal regime. If
> the fiduciary duty applied to nothing more than activities already
> controlled by other specific legal duties, it would serve no purpose.

*Id.  Curtis-Wright Corp. v. Schoonejongen*, 514 U.S. 73 (1995) on which the Fidelity Defendants

exclusively rely, not only pre-dated, but was distinguished by, *Varity*.  *See* 515 U.S. at 505.[28]

Further, courts routinely have rejected ERISA defendants' attempts to use securities laws

to limit their ERISA-mandated fiduciary disclosure obligations, refusing to dismiss complaints

on that basis.  *See In re Worldcom, Inc. ERISA Litig.*, 263 F. Supp. 2d 745, 767 (S.D.N.Y. 2003)

(rejecting defendants' argument that plaintiffs' ERISA complaint would impose duties on them

in excess of the securities law requirements); *Rankin,* 278 F. Supp. 2d at 877 ("Defendants' duty

to 'disclose or abstain' under the securities law does not immunize them from a claim that they

failed in their conduct as ERISA fiduciaries"); *Kling v. Fidelity Mgmt. Trust Co.,* 323 F. Supp.

2d 132, 143 n.10 (D. Mass. 2004) (same).

The Fidelity Defendants also claim that some of the information that *might* be provided

through an accounting or surcharge – information about the purposes for which the unreasonable

fees were used and the amounts received by the Fidelity Defendants and their affiliates – is

immaterial.  Such an argument is speculative, to say the least.  It is also premature, since it

assumes (1) the Court will grant Plaintiffs' request for any accounting or surcharge; (2) in the

---

[28]     *See also Jordan v. Federal Exp. Corp*., 116 F.3d 1005, 1012-13 (3d Cir. 1997) (fiduciary disclosure duties
"operate both independently from and in conjunction with ERISA's specifically delineated requirements."); *In re
Unisys Corp. Retiree Medical Ben. Litig.*, 57 F.3d at 1263 ("Furthermore, satisfaction by an employer as plan
administrator of its statutory disclosure obligations under ERISA does not foreclose the possibility that the plan
administrator may nonetheless breach its fiduciary duty owed plan participants to communicate candidly, if the plan
administrator simultaneously or subsequently makes material misrepresentations to those whom the duty of loyalty
and prudence are owed"); *Bixler v. Central Pennsylvania Teamsters Health & Welfare Fund*, 12 F.3d 1292, 1299
(3rd Cir. 1993) (fiduciary's duty to disclose not limited by explicit requirements of ERISA statute).

course of granting that remedy, the Fidelity Defendants will be required to make extensive disclosures; (3) some of those disclosures might be made to Plan participants; (4) some of these disclosures might involve the provision of *immaterial* information to Plan participants. Dismissal of a complaint because of the *possible, although unlikely*, consequences of a remedy that *might* be ordered at the end of the day is not required.

Nor are the details of the Fidelity Defendants' revenue sharing agreements immaterial as a matter of law under the federal securities laws. Plaintiffs allege that the Unisys Defendants at least should have known this information, so that the Unisys Defendants could fulfill their own fiduciary duties of ensuring that the Plan costs were reasonable. FAC, ¶ 51. Nor is the information necessarily immaterial to Plan participants. *See, e.g., Siemers*, 2007 WL 1140660, at *6 ("The full extent – as well is the existence – of the Wells Fargo revenue-sharing regime were material facts. They would have been significant and the total mix of information for making an investment decision."); *Siemers v. Wells Fargo & Co.*, No. 05-04518 WHA, 2007 WL 760750, *12, (N.D. Ca. Mar. 9, 2007) ("Given the competitiveness among funds for investor dollars, the sponsors had a strong incentive to hide the subject of revenue sharing, a subject that would logically reveal to potential customers that they would ultimately have to bear its burden"). *In re AIG Advisor Group Sec. Litig.*, No. 06 CV 1625 (JG), 2007 WL 1213395 at * 8-10 (E.D.N.Y. Apr. 25, 2007) (conflicts, and potential conflicts, of interest inherent in undisclosed revenue sharing payment systems make their nondisclosure material, despite defendants' alleged compliance with federal securities disclosure provisions; granting leave to amend to include more detail).[29]

---

[29]    *See also* Statement of Marvin Mann, Chairman of the Independent Trustees of The Fidelity Funds, Before the Senate Committee on Banking, Housing and Urban Affairs on "Review of Current Investigations and Regulatory Actions Regarding the Mutual Fund Industry:  Fund Operations and Governance" (March 2, 2004), *available at*

In sum, the Fidelity Defendants' alleged compliance with federal securities laws does not mean that they satisfied any duties imposed by ERISA nor does it mean that any remedy implicating disclosure is precluded by the federal securities laws, For these reasons, the remedies that Plaintiffs seek in Count II are appropriate equitable relief.

**B.      Count III States a Claim.**

In seeking that Count III be dismissed, the Fidelity Defendants principally argue that "any fees received by Fidelity entities have become part of a "commingled pool" and thus cannot be considered traceable."  Mem. at 27-28. However, "traceability" is not necessarily required.

The Fidelity Defendants rely on *Great-West Life & Annuity Insurance Company v. Knudsen,* in which the Supreme Court repeated the equitable rule that restitution is available "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in defendants' possession."  534 U.S. 204, 213 (2002).  However, as the Supreme Court explained last year in *Sereboff v. Mid-Atlantic Medical Services, Inc.,* --- U.S. ---, 126 S. Ct. 1869 (2006), its decision in *Great-West Life* did not endorse the strict "application of all restitutionary conditions—including restitutionary tracing rules—to every action for an equitable lien under § 502(a)(3)."  *Id.* at 1876.  *Great-West Life* simply described in general terms the conditions under which a fiduciary might recover when it was seeking equitable restitution.  As the Court stated, "[t]here was no need in [*Great-West Life*] to catalog all circumstances in which equitable liens were available in equity; Great-West claimed a right to recover in restitution, and in that case the Court concluded only that equitable restitution was unavailable because the funds sought were not in Knudson's possession."  *Sereboff,* 126 S.

<hr>

http://banking.senate.gov/_files/mann.pdf (testifying that mutual funds should provide an investor with a more detailed statement, itemizing the fees and expenses that will be paid by the investor *either directly or indirectly*...." Any eventual injunctive relief about which the Fidelity Defendants now claim concern would certainly be no more extensive than the disclosures for which Mr. Mann advocated.

Ct. at 1876. Here, however, Plaintiffs allege that the funds *are* in the Fidelity Defendants' possession so that their complaint does not suffer from that fault.

Second, there is no basis in the First Amended Complaint for the Fidelity Defendants' assertion; nor any to infer such in the Fidelity Defendants' favor. While Plaintiffs allege that the fees in question were sent through a mutual fund before reaching their ultimate holder, Plaintiffs allege that the amount of fees, expressed as a percentage of Plan contributions, existed before, during, and after the fees went into and out of the mutual fund. At the very least, whether these fees are traceable is a disputed factual issue. It is wholly improper to decide this question at the pleading stage.

Finally, under *Harris Trust,* a participant may seek "disgorgement" of proceeds disposed of by the immediate transferee through ERISA § 502(a)(3) if the transferee has reason to know that they were obtained in violation of ERISA. *Harris Trust & Sav. Bank*, 530 U.S. at 250-51; *Skretvedt v. E.I. DuPont De Nemours,* 372 F.3d 193, 214 (3rd Cir. 2004). To the extent that the Fidelity Defendants allege that the funds were "disposed of" in some way, Plaintiffs should be allowed to obtain disgorgement of profits.

**IV.     Plaintiffs Should Be Permitted to Amend Their Complaint.**

To the extent that the Court finds that Plaintiffs' allegations as pleaded do not satisfy the pleading requirements, Plaintiffs seek leave to amend their complaint.[30] It is "an abuse of discretion to dismiss without leave to amend where there is no delay, bad faith, futility or prejudice." *Bishop v. New Jersey Dept. of Corrections*, No. 05-5532 (RWB), 2007 WL 556894,

---

[30]     For example, if the Court finds that Plaintiffs insufficiently pleaded the circumstances of the Fidelity Defendants' control over the disposition of Plan assets, FMTC's co-fiduciary liability or the Fidelity Defendants' liability as non-fiduciaries, including their aiding and abetting the Unisys Defendants' violations of ERISA, as clearly authorized and allowed under *Board of Trustees of Teamster Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 173-74 (3rd Cir. 2003) and *Harris Trust*, Plaintiffs request permission to amend along the lines stated in this Memorandum.

at * 3 D.N.J. Feb. 13, 2007) (citing *Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000)).

As this Court is aware, this case is still in its infancy.  No discovery has been had, no responsive pleadings have been filed by the Defendants, no schedule has been fixed, and no trial date has been set.  Accordingly, the Defendants will not be prejudiced if an amendment is allowed, and the case will not be meaningfully delayed.

## CONCLUSION

For all of the foregoing reason, Plaintiffs respectfully request that this Court deny the Fidelity Defendants' Motion to Dismiss.

Respectfully Submitted,

SCHLICHTER, BOGARD & DENTON


__s/Elizabeth J. Hubertz_____
Jerome J. Schlichter
Elizabeth J. Hubertz (admitted *pro hac vice*)
Troy A. Doles
100 South Fourth Street
Suite 900
St. Louis, MO 63102
Tel:    314-621-6115
Fax:    314-621-7151
Lead Counsel for Plaintiffs


Theodore H. Jobes
Fox Rothschild LLP
2000 Market Street, Tenth Floor
Philadelphia, PA 19103
Tel:    215-299-2786
Fax:    215-299-2150
Local Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

This is to certify that on October 9, 2007, a copy of the above was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

Joseph J. Costello
jcostello@morganlewis.com
Brian T. Ortelere
boretelere@morganlewis.com
Jamie M. Kohen
jkohen@morganlewis.com
1701 Market Street
Philadelphia, PA 19103
Tel: 215.963.5295/5150/5472
Fax: 215.963.5001
Counsel for the Unisys Defendants

Stephen Harburg
Shannon Barrett
Stephen Brody
O'Melveny & Myers
1625 Eye Street, NW
Washington, DC 20006
Tel: 202.383.5300
Fax: 202.383.5414
Counsel for FMTC, FMRCo and FIIOC

John S. Summers (PA ID No. 41854)
HANGLEY ARONCHICK SEGAL & PUDLIN
One Logan Square
27th Floor
Philadelphia, PA 19103-6933
Telephone: (215) 568-6200
Fax: (215) 568-0300
Counsel for FMTC, FMRCo and FIIOC


     s/Elizabeth J. Hubertz
Counsel of Record